# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CORDELL T. THOMPSON, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| MICHAEL J. ASTRUE, | : | No. 09-3383 |
| COMMISSIONER OF THE | : | |
| SOCIAL SECURITY ADMINISTRATION | : | |
| Defendant. | : | |

## MEMORANDUM RE: SOCIAL SECURITY APPEAL

**Baylson, J.**                                                                                                                    **April 27, 2010**

Plaintiff, Cordell T. Thompson, seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant"), denying his application for Social Security disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433. (Docket No. 8.) For the reasons described below, the Court will affirm the decision of the Administrative Law Judge ("ALJ") and deny Thompson's request for benefits or a new hearing.

## I. Factual and Procedural Background

Thompson applied for social security benefits on May 25, 2005. (R.87.) Thompson was born in September 1960 (R. 87, 103, 108), and is defined as a "younger person" by the relevant social security regulations, see 20 C.F.R. § 404.1563 (2009). Previously, Thompson worked as a laborer, completed a five-year apprenticeship program with the electrical union, and worked as a

union electrician for approximately twelve years. (R. 44-45, 245-46, & 292.) Thompson reported graduating from high school, attending Pennsylvania Institute of Technology for a year and a half, and completing two years of college, including classes taken in 2005-2006, during his alleged period of disability.[1] (R. 44.) Thompson is able to communicate in English. (R. 22.)

According to Thompson, he became disabled on October 1, 2002, and was unable to work due to dyslexia, irritable bowel syndrome ("IBS"), abdominal pain, and post-traumatic stress disorder. (R. 89, 103.) On September 2, 2005, the Social Security Administration ("SSA") denied Thompson's application. (R. 89-93.) Thompson filed a new claim on September 8, 2005, again alleging that he became disabled on October 1, 2002. (R. 106-107.) In his second application, Thompson averred that he was unable to work due to dyslexia and IBS, but stated that he did "not have a mental condition that would limit his ability to work." (R. 93, 155-56.) On January 27, 2006, the SSA denied Thompson's second application. (R.93-96.) Thompson timely requested an administrative hearing (R. 97), which was held on April 27, 2007 (R. 15, 43).

At the hearing, the ALJ heard testimony from Thompson, who testified that he suffered from "[g]eneralized anxiety and post traumatic stress." (R. 46.) In addition, a medical expert ("ME") who had reviewed Thompson's medical file, testified that Thompson was "moderately impaired" but could work, so long as the work was predictable and would not involve "a lot of

---

[1] In December 2005, Thompson was taking six credits at a community college, and the OVR and Thompson's Client Assistance Program Representative informally agreed that Thompson would enroll in a full-time course load of twelve or more college credits. (R. 360-61.)

independent judgments." (R. 62.) The ALJ also heard testimony from a vocational expert ("VE"). (R. 15, 43.)

After the hearing, Thompson submitted additional evidence, predominantly consisting of case Progress Notes authored by his Rehabilitation Counselor from the Office of Vocational Rehabilitation ("OVR"). (R. 331-69.) On May 25, 2007, the ALJ issued a decision denying Thompson's benefits claim. (R. 15-23.)

The ALJ found that Thompson "meets the insured status requirements" of the Act, and "has not engaged in substantial gainful activity since October 1, 2002, the alleged onset date." (R. 17.) The ALJ then determined that Thompson suffers from two severe impairments, anxiety disorder and personality disorder, that "cause significant limitation in [his] ability to perform basic work activities." (R. 17.) The ALJ, however, determined that Thompson's complaints of IBS, right leg problems, back pain, and obesity, "would have no more than a minimal effect" on his ability to work. (R. 17.)

Respecting Thompson's ability to work, the ALJ found that the ME had "testified that the record supports findings that these impairments cause mild restriction in activities of daily living," and "moderate" difficulties with social functioning and maintaining concentration, persistence, and pace, and that "there have been no episodes of decompensation of extended duration." (R. 18.) In addition, the ALJ found that "[m]ost treatment notes are indicative of mild to moderate functional restrictions." (R. 21.) The ALJ then determined that Thompson "has the residual functional capacity to perform work activities" because Thompson's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible," and "no findings . . . support the . . . totally disabling allegations." (R. 20, 21.) The

ALJ, however, also found that "[d]ue to emotional impairments, [Thompson] requires a predictable type of job utilizing his verbal [skills] and intelligence in a stable environment not requiring independent judgment."  (R. 18.)  The ALJ summarized the VE's testimony as providing that an individual with such limitations could work in an unskilled occupation, which "exist[] in significant numbers in the national economy."  (R. 22.)  Accordingly, the ALJ concluded that a "finding of 'not disabled' is therefore appropriate" for Thompson.  (R. 23.)

Thompson timely appealed from the ALJ's decision by filing the pending Request for Review.

## II.     The Parties' Contentions

### A.     Thompson's Objections

Thompson challenges the ALJ's decision on the grounds that (1) the ALJ failed to proffer evidence Thompson submitted after the hearing to the ME, (2) the ALJ improperly substituted his judgment for that of the ME, and (3) the ALJ improperly relied upon an incomplete hypothetical question posed to the VE.  Turning first to the ALJ's failure to proffer post-hearing evidence to the ME, Thompson contends that such behavior "violated" the Commissioner's own Hearings, Appeals and Litigation Law Manual ("HALLEX"), available at http://www.ssa.gov/OP_Home/hallex/hallex-I.html (last visited Apr. 9, 2010).  (Pl.'s Br. 8.)  According to Thompson, the ALJ's error requires reversal because "the new evidence highlights the extent to which Mr. Thompson's personality disorder has impacted upon his interaction with professionals, including those at the [OVR] who seek to assist him," and because "it is impossible to know whether [the ME's] testimony would have remained the same had she been given an opportunity to review" the additional evidence.  (Pl.'s Br. 8-9.)

Next, Thompson avers that the transcript from the hearing demonstrates that the ALJ "did not accept or believe [the ME]'s testimony regarding Mr. Thompson's various phobias, and that [the ALJ] expressly directed [the ME] not to testify about the impact of this medically determinable impairment which, as [the ME] stated, has support in the record." (Pl.'s Br. 11.) Thompson concludes that the transcript shows that the ALJ substituted his uninformed lay opinion for that of the ME, which is prohibited by Third Circuit law, and that the ALJ erred in this case by not allowing the ME to comment on how the phobias impacted Thompson's ability to work. (Pl.'s Br. 12-13.) In addition, Thompson contends that the ALJ's refusal to allow the ME to consider "limitations arising from Mr. Thompson's various phobias" constitutes "reversible error." (Pl.'s Br. 14.)

Thompson then contends that the ALJ posed an incomplete hypothetical question to the VE, by failing to "proffer evidence to [the ME] which may have changed her opinion," and by basing the hypothetical on the ME's stated opinion. (Pl.'s Br. 15.) Thompson concludes by averring that the ALJ's errors are "particularly egregious given the level of this denial," that being a denial at step five, when the Commissioner purportedly bears the burden of showing that Thompson can perform jobs available in the regional and national economy. (Pl.'s Br. 15.)

### B. The Commissioner's Response

The Commissioner avers that Thompson's arguments should be rejected, and that the ALJ's decisions should be affirmed. Respecting the ALJ's decision to not proffer post-hearing evidence to the ME, the Commissioner contends that the ALJ was entitled to make a decision without doing so, and that case law has emphasized that ALJs need not contact physicians for additional information if the information before the ALJ is not inadequate. (Def.'s Resp. 14, 17.)

The Commissioner continues that the HALLEX provides only guidelines that do not require more than the controlling regulations, and in any event, only refer to review of evidence "received at the hearing." (Def.'s Resp. 19.) The Commission also argues that requiring ALJs to proffer any post-hearing evidence to MEs "would greatly impede the administrative process and run counter to the Commissioner's regulations, which give the ALJ the discretion to determine whether further development of the record is required," and would "encourage the late submission of evidence after medical expert testimony in order to create a technical basis for remand." (Def.'s Resp. 19.)

In response to Thompson's contention that the ALJ substituted his judgment for that of the ME respecting Thompson's phobias, the Commissioner responds that the ALJ properly posed questions to the ME in order to understand Thompson's vocationally relevant functional limitations. (Def.'s Resp. 8.) The Commissioner further avers that because various of Thompson's doctors had not diagnosed phobias in their reports, "the ALJ was entitled to question [the ME]'s characterization of Thompson's impairment as a phobia." (Def.'s Resp. 9.) In addition, the Commissioner contends that rather than resorting to his lay opinion, the ALJ "posed a series of questions to the [ME] in an effort to better understand Thompson's psychological impairments in the context of the entire record and, more importantly, any vocationally relevant functional limitations resulting therefrom." (Def.'s Resp. 10.) According to the Commissioner, the ALJ's conclusion that Thompson is not disabled is supported by the ME's opinion that Thompson was not "'disabled in terms of mental impairment. . . . to the degree to preclude him being able to work.'" (Def.'s Resp. 11 (quoting R. 65) (alteration added).)

As for the ALJ's purportedly incomplete hypothetical question, the Commissioner avers that "a hypothetical question need reflect only those impairments that are supported by the record," and "the evidence which Thompson submitted subsequent to the administrative hearing did not establish any additional work-related functional limitations." (Def.'s Resp. 20.) Moreover, the Commissioner contends that "the ALJ posed a hypothetical question to the VE fairly set forth all of Thompson's limitations," and thus, Thompson's objections are without merit. (Def.'s Resp. 21.) The Commissioner also avers that even at step five, the claimant bears the burden of proving that he is disabled. (Def.'s Resp. 7-8.)

## III. Legal Standards

### A. Jurisdiction

The Social Security Act provides for judicial review by this Court of "any final decision of the Commissioner of Social Security made after a hearing." 42 U.S.C. § 405(g). A district court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Id.

### B. Standard of Review

On judicial review of the decision, the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." Id. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Id. (internal quotation marks omitted). In reviewing the record for substantial evidence, however, this Court must "not weigh the evidence or substitute [its]

own conclusions for those of the fact-finder." Id. (internal quotation marks and alteration omitted). The substantial evidence standard is deferential to administrative decisions regarding disability benefits, including "inferences drawn from the facts if they, in turn, are supported by substantial evidence." Schaudeck v. Comm'r of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Despite such deference, reviewing courts "retain a responsibility to scrutinize the entire record and to reverse or remand if the Commissioner's decision is not supported by substantial evidence." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotation marks and alterations omitted).

As for the legal standards applied in the case, this Court's review is plenary. Allen v. Barnhart, 417 F.3d 396, 398 (3d Cir. 2005).

**C.     Social Security Disability Evaluation Process**

In considering whether an individual is disabled, the Social Security Administration has set forth a five-step evaluation process for claimants seeking social security disability benefits. First, the ALJ must consider the claimant's work activity; if the claimant is currently engaging in substantial gainful activity, the claimant will not be considered disabled. 20 C.F.R. § 404.1520(a)(4)(i) (2008). Second, the ALJ examines whether the claimant has a "severe impairment" or "combination of impairments"; if the impairment or combination is not "severe," the claimant is determined to be not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ then considers whether the claimant's impairment "meets or equals" one of the pre-approved impairments in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). If, however, the impairment is not pre-approved, the ALJ next evaluates whether the claimant's residual functional capacity permits the claimant to perform any of her past work history; should the

claimant be able to perform any of her prior jobs, she is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, at the fifth step, the ALJ examines the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant would be capable of returning to the workforce. 20 C.F.R. § 404.1520(a)(4)(v).

The parties dispute who bears the burden of proof with respect to step five of the disability evaluation process. Thompson contends that once a claimant has "made out a prima facie case for disability benefits," the Commissioner bears the "burden to rebut that case with substantial evidence that [the Plaintiff] can perform alternative jobs." (Pl.'s Br. 6.) The Commissioner, however, avers that "[t]he burden is always on the claimant to prove his medical condition and functional limitations," and "[a]t step five, only the burden of production shifts to the Commissioner to demonstrate that alternative jobs exist in the national economy that the claimant can perform." (Def.'s Br. 7.)

Third Circuit case law supports the Commissioner's contention. In Torres v. Schweiker, 682 F.2d 109 (3d Cir. 1982), the Third Circuit rejected the exact argument that Thompson advances, and addressed the circuit split over which party bears the burden of proof respecting step five. The Torres Court determined that the "broad language" of the Act which generally requires a claimant to furnish evidence demonstrating her disability, "place[s] the burden of proof as to the medical basis of a finding of disability on the claimant at all times." Id. at 311 (citing 42 U.S.C. § 423(d)(5) (1976)). Moreover, the Third Circuit has expressly stated that at step five, "'the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.'" Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (quoting Plummer v. Apfel, 186 F.3d 422,

428 (3d Cir. 1999)). Accordingly, at all times, Thompson bears the burden of showing that he is disabled, and at step five, the Commissioner bears the burden of production respecting Thompson's ability to perform alternative jobs in the national economy.

IV.     Discussion

According to Thompson, the ALJ committed reversible error by (1) failing to proffer post-hearing evidence to the ME, (2) improperly substituting his judgment for that of the ME, and (3) improperly relying upon an incomplete hypothetical question posed to the VE. The Court will address each of Thompson's objections to the ALJ's decision in turn.

   A.     **The ALJ's Decision to Not Proffer Post-Hearing Evidence to the ME**

Thompson contends that the ALJ's decision not to proffer to the ME evidence Thompson submitted after his hearing[2] violated Section I-2-5-36(A) of the HALLEX, which provides, in relevant part:

> The ALJ or designee will, before the hearing, furnish the ME with copies of the pertinent medical reports and written lay evidence. If additional medical evidence

---

[2] The post-hearing evidence, predominantly comprising Progress Notes authored by his OVR counselor, and dating from December 2003 to March 2006 (R. 331-369), shows that Thompson complained of dyslexia problems, and was to be treated with cognitive retraining. (R. 331, 351, & 353.) The post-hearing evidence also indicates that Thompson repeatedly emphasized in his meetings with the OVR that he aimed to be a patent attorney, and took college classes in 2005 to work towards that goal. (R. 360-61, 363, 365, & 367.) Thompson's counselor, however, disagreed that an attorney was an appropriate goal given Thompson's dyslexia, anxiety, and concentration problems, and thought a "visual" or "hands-on" vocation would be more suitable. (R. 363.) The Progress Notes also demonstrate that Thompson complained of back pain and contended that he had received treatment for a ruptured disk, but his counselor found no diagnoses to this effect, except a prescription of pain medicine. (R. 364.) In addition, Thompson asked at various of his meetings to receive copies of his medical records, and followed up when he had not obtained these. (R. 341, 343, 367.) The Progress Notes also indicate that Thompson arrived late to one meeting, later accused his counselor of misrepresenting his tardiness and twice showed up at his counselor's office without an appointment. (R. 332, 341, & 343.)

-10-

> is received at the hearing, the ALJ will, if possible, provide it to the ME for review before the ME testifies. If this is not possible, the ALJ may proceed with testimony from the ME and then send the ME interrogatories post-hearing to ascertain what impact the new evidence may have on the testimony given in the hearing.

The Introduction to the HALLEX, however, states that the "purpose" of the Manual is for "the Associate Commissioner of Hearings and Appeals [to] convey[] guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff." HALLEX § I-1-0-1. In addition, the Third Circuit has explained that the HALLEX "lack[s] force of law and create[s] no judicially-enforceable rights." Bordes v. Comm'r of Soc. Sec., 235 F. App'x 853, 859 (3d Cir. 2007) (non-precedential); see also Schweiker v. Hansen, 450 U.S. 785, 789 (1981) (holding that the Social Security Administration Claims Manual "has no legal force, and . . . does not bind the SSA"); Bordes, 235 F. App'x at 859 (citing cases); Hitchcock v. Comm'r of Soc. Sec. Admin., No. 09-0551, 2009 WL 5178806, at *10 (W.D. Pa. 2009) ("[T]he HALLEX is an internal guidance tool and has no legal force; thus, it is not judicially enforceable or binding."). An "objection to [a] violation of a HALLEX provision [i]s not cognizable," when "the claimant had not shown that she was prejudiced by the violation." Estrella v. Astrue, No. 08-5804, 2010 WL 742618, at *3 (E.D. Pa. 2010) (Padova, J.); see also Bourdes, 235 F. App'x at 859 (dismissing a claimant's appeal from the ALJ's decision on the ground that the ALJ violated a HALLEX provision, because "no prejudice has been shown").

Here, it is far from clear that the ALJ violated Section I-2-5-36(A). Although it embodies the principle that the ALJ should, whenever possible, permit the ME to review submitted medical records, the provision uses permissible language to discuss how the ALJ "may" proceed with ME testimony that is not based on additional evidence, and later send the materials to the ME to

ascertain what effect, if any, the additional evidence has on the ME's opinion. In effect, Section I-2-5-36(A) falls short of requiring the ALJ to provide the ME with additional materials. Moreover, the express language of that section concerns when "additional evidence is received at the hearing," and at no point mentions post-hearing evidence. The Court, therefore, concludes that Section I-2-5-36(A) does not impose an affirmative duty on an ALJ to submit post-hearing materials to the ME for review.[3]

The SSA has also clarified in Social Security Ruling 96-6p that an ALJ is only required to "obtain an updated medical opinion" from a ME in the following circumstances:

> [w]hen no additional medical evidence is received, but in the opinion of the [ALJ] the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or [w]hen additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

Such language again emphasizes deference to the ALJ's determination of whether an updated ME opinion is necessary. See Piper v. Astrue, No. 06-3802, 2008 WL 3368907, at *16 (D. Minn. 2008) ("As provided in SSR 96-6p, the ALJ is only required to obtain an ME opinion when he finds that [the additional] evidence . . . would change [the ME's medical opinion.]"). Because Thompson has not shown that the ALJ violated the language of Section I-2-5-36(A), the

---

[3]This conclusion is further supported by the fact that the ALJ is not required to seek additional or clarifying information from a claimant's treating physician when the physician's records are not "inadequate . . . to determine whether [the claimant] is disabled." 20 C.F.R. § 404.1512(e). In Truett v. Barnhart, No. 04-5375, 2005 WL 3261741, at *4 (E.D. Pa. 2005), Judge Robreno rejected a claimant's assertion that an ALJ must affirmatively contact a treating physician if the medical evidence is "inconsistent." Specifically, Judge Robreno reasoned that the ALJ has the "discretionary authority . . . to proceed in making a determination, despite the existence of inconsistent evidence," so long as "the ALJ can make a determination based on the evidence in [his] possession." Id.

Court concludes that the ALJ's decision should not be reversed or remanded for not proffering Thompson's post-hearing evidence to the ME.

### B. The ALJ's Questioning of the ME, and Conclusions Respecting Thompson's "Phobias"

During Thompson's hearing, the ALJ had the following exchange with the ME:

[ME]: [Thompson] has a particular fear of doctors or medical or dental surgery. . . . He has . . . a list of rather specific phobias, mostly pertaining to healthcare issues, such as f[e]ar of needles, doctors, hospitals, blood, surgery . . . , x-rays, dental work, and anxiety disorders. . . . I think there are phobias that . . . him to avoid medical treatment. Why are you shaking your head?

[ALJ]: Well, you're calling it a phobia and he just doesn't want to get them done because he's anxious about them. You call that a phobia?

[ME]: Yes.

[ALJ]: What is a phobia?

[ME]: It is a persistent reaction, it is a reaction causing someone to avoid situations that are irrational.

\* \* \*

It's not just based on that letter. There are many other professionals that have noted that many times.

\* \* \*

[Thompson] discussed this extreme anxiety with most invasive medicine including surgery, needles, blood work, etcetera. He's had blood in his stool and Dr. Leonard wanted to a colonoscopy and that they settled, negotiated on a sigmoidoscopy.

[ALJ]: Well, that, you know, if you've had either of those procedures . . . that the sigmoidoscopy is much worse than the colonoscopy.

\* \* \*

So it doesn't make sense.

\* \* \*

All right. He's got anxiety. Tell us about the anxiety. Forget the phobia.

(R. 58- 61.)

Thompson contends that this exchange demonstrates that the ALJ "substituted his own uninformed lay opinion" for that of the ME and other medical experts by not "accept[ing] or believ[ing]" the ME's testimony regarding Thompson's "various phobias" and instead, expressly directing the ME "not to testify about the impact of this medically determinable impairment." (Pl.'s Br. 11-12.)

The Third Circuit has made clear that "an ALJ is not free to set his own expertise against that of physicians who present competent medical evidence." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Upon review of the record, however, this Court has determined that the ALJ's finding that this is not a case in which the "ALJ improperly supplanted" physicians' medical opinions "with his personal observation and speculation." Id. at 318.

The ME only discussed Thompson's purported phobias as part and parcel of his "constellation . . . of different anxiety disorders" (R. 61),[4] rather than as a separate emotional impairment. Similarly, Thompson's consulting physician, Dr. Lief, described Thompson's phobias as being part of Thompson's anxiety problems. Dr. Lief's report discusses Thompson's "number of discreet phobias, most of which are related to medical care, blood, the fear of needles and dental surgery," which are all described under the heading of "[a]nxiety." (R. 260.) Although somewhat questioning whether Thompson's irrational fears rose to the level of being

---

[4]The ME's testimony, in relevant part, provided:

I think he's got a constellation of anxieties, of different anxiety disorders really. I mean he has the phobia. He has recurrent obsessions or compulsions such as always having to go to his home in order to leave, in order to go anywhere else. He also, well he reported and there is mention in the chart of discussion of the World Trade Center issues. He reported here a very vivid recurrent dream he has that he was among those men who died.

(R. 61.)

phobias, the ALJ by no means failed to credit the ME or other physicians' medical opinions respecting Thompson's anxiety; instead, the ALJ's decision is supported by substantial evidence in the record. See Rutherford, 399 F.3d at 552.

After explaining that phobias constituted one of the many anxiety disorders Thompson suffered, the ME determined that "anxiety" as well as "an obsessive compulsive personality disorder" were Thompson's "root problem[s]" that "mildly impaired" Thompson's daily living, "moderate" difficulties with social functioning, "moderately impaired" his "concentration, persistence, and pace." (R. 61-62.) Notwithstanding these impairments, the ME also opined that Thompson's subjective complaints about "having a lot of trouble focusing" was not supported by the record, and that Thompson would not "further decompensate with [the] additional stress of the job." (R. 61-62.) The ME then concluded that Thompson was not "disabled to the degree to preclude him being able to work" (R. 65), as long as he had "a predictable kind of work so that he wouldn't have to make a lot of independent judgments along the way," and that "a job that utilized his verbal skills and intelligence . . . would capture his interest enough to perhaps counteract the anxiety that he might feel about doing it" (R. 62).

The ALJ's decision, rather than discarding the ME's testimony, relied heavily upon it, and arrived at the same conclusions. The ALJ agreed with the ME that Thompson suffered from "emotional impairments," that require "a predictable type of job utilizing his verbal [skills] and intelligence in a stable environment not requiring independent judgment." (R. 21.) In arriving at this conclusion, the ALJ correctly characterized the ME as having testified that while Thompson suffered from mild to moderate impairments, these impairments "did not prevent him from working." (R. 21.) The ALJ, like the ME, did not "fully credit" Thompson's allegations of, and

his consulting physician's opinion that he suffered from, "total disability," given that "[t]he record indicates no significant work precluding exertional or emotional limitations," and "no other treating or consulting physician[s] indicated that [Thompson] was incapable of performing work activities on any sustained basis." (R. 21.)

In addition to the ME's testimony, the ALJ's decision was supported by Thompson's post-hearing submissions. Rather than identifying new impairments, such evidence appears to confirm the ME and ALJ's conclusions that Thompson had moderate difficulties in interacting with other individuals, given that he arrived late to a meeting, later accused his counselor of misrepresenting his tardiness, and twice showed up at his counselor's office without an appointment (R. 332, 341, & 343), and had concentration and anxiety problems (R. 331, 351, & 353.) Although Thompson complained of back pain, his vocational counselor, upon examining the record, found nothing to support Thompson's claim that he had received treatment for a ruptured disk, other than a prescription of pain medication (R. 363), thereby supporting the ALJ's conclusion that Thompson's subjective complaints of pain were exaggerated and "not entirely credible." (R. 20.) In addition, the post-hearing submissions indicate that Thompson's vocational counselor believed that Thompson remained able to work in a "visual" or "hands-on" vocation, and that Thompson in fact took classes to meet his goal of becoming a patent attorney. (R. 360-61, 363, 365, & 367.) Progress Notes from October to December 2005 also indicates that Thompson's anxiety and depression had subsided or diminished (R. 360), again supporting the ALJ's conclusion that Thompson is not totally disabled.

As for the availability of jobs suitable for Thompson, the VE testified at the hearing that Thompson was "[n]ot a good candidate for training, skilled training . . . whether that be

intellectual exercise such as college level or learning to be an electrician," but that "he would not be unable to sustain an un-skilled, repetitive job that requires little or no concentration." (R. 83.) The VE concluded that although Thompson could not engage in his old job as an electrician, there are numerous non-skilled jobs available regionally and nationally.[5] (R. 72.) Based upon such evidence, the Court has determined that substantial evidence in the record supports the ALJ's conclusion that Thompson, despite suffering from emotional impairments, had the residual capacity to perform non-skilled jobs available in the regional and national economy.

### C. The ALJ's Hypothetical Question to the VE

During Thompson's hearing, the ALJ posed the following hypothetical to the VE:

> [W]e have a 46 year old gentleman with a high school education and two years of college and a journeyman union electrician for past relevant work . . . . And this person has no exertional impairments but does have mental impairments. Mental impairments are described as being mild impairment of the ability to perform activities of daily living. Moderate impairments of the social functioning and moderate impairments of the ability to maintain concentration, persistence and pace. There have been no episodes of deterioration of extended duration. This person does have occasional impairments which would relegate this person to jobs in a stable environment, that is to say one that does not have a great deal of changes or adjustments to be made in their work routines and also he would have to have a job which would not require him to exercise . . . any independent judgments. Now if you put those impairments all together, would there be any work which such a person could perform[?]

---

[5]Specifically, the VE stated as follows:

> [A]s far as cleaners, there are over 60,000 in the Philadelphia region between light and medium that, and over 2 million nationally. There are jobs such as dishwashers [of which] [t]here are over 7,000 . . . in the region, 500,000 nationally. There [is] not a whole lot of unpredictability in those jobs. They're pretty much routine, the same thing over and over again. Or you can even go to looking at hand packers of which there are lots of DOT titles in, within that category. Mainly light and medium. But even just looking at light, there are about 4,000 in the region, 300,000 nationally.

(R. 72.)

(R. 71-72.) The VE responded that "those factors really speak to un-skilled work," of which there are numerous jobs available regionally and nationally. (R. 72.) Thompson contends that the ALJ's hypothetical is incomplete because the ALJ failed to proffer the post-hearing evidence Thompson submitted to the ME, and because the ALJ purportedly did not permit the ME to consider limitations arising from Thompson's "phobias." (Pl.'s Br. 15.) As

The Third Circuit has explained that a hypothetical question posed by the ALJ to the VE must "accurately portray[] the claimant's individual physical and mental impairments," and "[t]hus[,] the expert must have evaluated claimant's particular impairments as contained in the record." Rutherford, 399 F.3d at 554 (internal quotation marks omitted). The Third Circuit, however, has explained that this quoted language should "not be misunderstood" as requiring an ALJ "to submit to the [VE] every impairment alleged by a claimant. Instead[,] . . . references to all impairments encompass only those that are medically established [and] the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations." Id. (internal quotation marks and citations omitted).

Here, the record amply demonstrates that the ALJ did not fail to convey medically established impairments. Turning first to the ALJ's decision to not proffer the post-hearing evidence to the ME, the Court has already explained that Thompson has not shown that the ALJ violated any duty he had to submit additional evidence to the ME. In addition, Thompson has not identified any "medically established" impairment contained in the post-hearing evidence that the ALJ failed to convey, nor has the Court found any. As already explained, the Court has examined the post-hearing evidence and found that it confirms the ALJ's findings and conclusions. The Court, therefore, cannot find that the post-hearing evidence presented new

medical impairments that should have been proffered to the ME and included in the hypothetical question to the VE. Moreover, as a practical matter, even assuming arguendo that Thompson could make such a showing, this Court cannot require the ALJ to provide a hypothetical to the VE at the hearing, that incorporates later discovered evidence, that being evidence that has not been made available before or at the hearing.

As for Thompson's purported "phobias," as detailed above, they constituted merely one of his numerous anxiety disorders; the ALJ's hypothetical to the VE expressly conveyed Thompson's "mental impairments" and communicated the ME's testimony that such impairments resulted in mild impairment of Thompson's daily activities, and moderate difficulties in social functioning, and in his ability to maintain concentration. (R. 71.) Accordingly, the Court has determined that the hypothetical question ALJ posed to the VE did not inaccurately portray Thompson's individual physical and mental limitations.

## V.     Conclusion

For the reasons detailed above, the Court concludes that the ALJ possessed substantial evidence in support of his decision, and did not err in concluding, based on the entire record of medical evidence, that although Thompson suffered from severe mental impairments, he had the residual capacity to perform some jobs available in the national economy, and thus was not disabled.

An appropriate Order follows.

O:\CIVIL 09-10\09-3383 Thompson v. Astrue\Thompson Soc Sec Mem.wpd